### RIGHT OF REVIEW IN NATURALIZATION PROCEEDINGS.

Court of Appeals for Cuyahoga County.

IN RE NATURALIZATION OF VURA.

Decided, October 20, 1913.

*Naturalization—Jurisdiction of State Courts—Procedure and Review —Courts of Appeals—Error Proceedings.*

1. The Congress of the United States having by apt legislation conferred upon certain state courts the power to admit aliens to citizenship and to administer the naturalization laws of the country, sharing with such courts the jurisdiction of the federal courts over that subject, the power may be exercised according to the laws of procedure governing the state courts, as an incident to the power conferred, including any right of review to which an aggrieved party may be entitled by state law; and this, although such right of review is withheld when naturalization laws are administered in the federal courts.
2. Error will lie in the courts of appeals of Ohio from a judgment of the court of common pleas refusing to admit an alien to citizenship.

*Bartholomew, Leeper & White,* for plaintiff in error.
*J. B. Waterworth,* contra.

GRANT, J.

This is a petition in error, the object and prayer of which is to reverse the judgment of the court of common pleas of this county refusing the application of Stephen Vura for admission to citizenship of the United States, under the laws permitting the naturalization of aliens.

The assignment of error is that the finding of the court below, that the applicant was not entitled to be admitted as a citizen, and the judgment of that court dismissing his application are contrary to the weight of the evidence.

The Government of the United States has intervened in this proceeding, and has been heard at the bar, objecting *in limine* to this court entertaining the petition in error, on the ground that it has no jurisdiction to hear the controversy and no power to determine the applicant's contention.

We are first to dispose of this preliminary question. Our immediate jurisdiction, if there is any, is conferred by the organic law of Ohio, under which this court is organized and proceeds.

By that law, Constitution of 1912, Section 6, Article IV, the right and duty of this court to review upon petition in error the action of inferior courts extends to all judgments and final orders of the courts of common pleas. This provision, it is believed, comprehends the case brought before us for review by the present record, the court below being one that has common law jurisdiction, a clerk and a seal.

The right to naturalize foreigners in the first instance is reserved to the United States by its Constitution, which is the source and foundation of authority in the whole matter. The language of that instrument in this respect, Section 8, Article I, is:

"The Congress shall have power  *  *  *  to establish an uniform rule of naturalization,  *  *  *  to make all laws which shall be necessary and proper for carrying into execution the foregoing powers."  *  *  *

By adopting the Constitution, including this provision, the states have made Congress the exclusive depositary of the power to clothe aliens with the rights of citizenship. But it does not follow from this assent that Congress must employ only federal courts or other agencies in its exercise of the power thus reserved. It is a constitutional principle, too plain for dispute, that even without express authority from Congress the states through their courts or otherwise, may occupy a field of jurisdiction by the Federal Constitution reserved to the general government, when and so long as the latter does not occupy it. Says Cooley, Principles of the Constitution (3d Ed.), page 35:

"The mere grant of a power to Congress does not of itself necessarily imply a prohibition upon the states to exercise the like power. The full sphere of federal powers may, at the discretion of Congress, be occupied or not, as the wisdom of that body may determine."

And again, page 70, when dealing with the right of Congress to regulate interstate commerce, the same learned author says:

"But the mere existence of this power in Congress does not necessarily exclude the states from all authority whatever which might affect the commerce falling within the control of Congress, provided no actual legislation of Congress is interfered with."

And he mentions as allowable action by the states, laws establishing quarantine against noxious diseases from foreign ports, and those requiring locomotive engineers to be examined for color-blindness, even while engaged in interstate commercial traffic. The Federal Constitution does not, by its own force, completely provide for the exercise of the powers created by it, except in the relatively few cases of which the Supreme Court must take cognizance.

"For other cases," says Cooley, page 124, "it is necessary that courts shall be created by Congress, and their respective jurisdictions defined; and in creating them Congress may confer upon each so much of the judicial power of the United States as to its wisdom shall seem proper and suitable, and restrict that which is conferred at discretion. In doing so it may apportion among the several federal courts all the judicial power of the United States, or it may apportion a part only, and in that case what is not apportioned will be left to be exercised by the courts of the states. Thus the states may have a limited jurisdiction within the sphere of the judicial power of the United States, but subject to be further limited or wholly taken away by subsequent federal legislation. Such is the state of the law at this time: many cases within the reach of the judicial power of the United States are left wholly to the state courts, while in many others the state courts are permitted to exercise a jurisdiction concurrent with that of the federal courts, but with a final review of their judgments on questions of federal law in the United States Supreme Court."

We do not, however, have to rely on this idea—negatively postulated—of the failure of the general government to occupy the entire field of jurisdiction. We may conceive that if by non-user the United States may thereby impliedly allow state tribunals to act in exercising a power which the Constitution has created, not vainly but to be exercised, with better reason it may reach the same end affirmatively by abdicating in favor of the state courts, by surrendering to them, in whole or partly, or by parceling to them, together with its own judiciary, the exer-

cise of the powers created by the Constitution of the United
States in respect of naturalizations. We submit that as matter
of history Congress has done both of these things. First, it
abdicated to the states. It surrendered to them the entire exer-
cise of the right to admit aliens to citizenship. By the act of
1790, jurisdiction in matters of naturalization was conferred
upon state courts exclusively. And, second, it was not till 1802
that the power was extended to federal tribunals, to be shared
by them with the state courts. This duality of jurisdiction has
continued unimpaired and unquestioned up to this moment.
Indeed it is not, *per se,* called in question now. The claim of the
district attorney's office, if we understand the argument made
at the bar, is this: The right of the state courts to grant or
deny naturalization in the first instance is conceded; but it is
denied that the right of review at the instance of an aggrieved
applicant exists. In other words, while Congress has adopted
the state courts as its judicial agents in the matter of admitting
aliens to citizenship, it refuses to recognize the procedure of
those courts, as prescribed in the statutes by which they are cre-
ated, and which they are bound to follow and obey. The idea
seems to be that up to the point of admitting or refusing to
admit the foreigner as a citizen the state courts may act, but
that when it comes to the question of a review of their action
at the suit of an aggrieved applicant the forum must be changed
and the matter disposed of according to the course of procedure
of the federal tribunals, which it is said do not allow a review
of the case.

It is hardly conceivable, we think, that a state court clothed
with jurisdiction, with the power to hear and determine, can
be compelled by construction only to carve up this power and
deny a remedy to which he thinks he is entitled to the man of
whose petition it has taken jurisdiction and which the law to
which that court owes not only its allegiance but its existence
gives him. And especially is this difficult to conceive when we
consider that he who advances this claim, he who serves this
writ of prohibition, gives notice that if the point is yielded and
the wronged suitor is turned over to the federal jurisdiction
no review will be given him. If the position taken is tenable,
then between 1790 and 1802 there was no right of review in
naturalization cases. For if the jurisdiction of the state courts

was cut off at the point of review, and the federal courts had been given no jurisdiction at all in this class of cases, neither the applicant who considered himself wronged, nor the government which might have thought itself saddled with a bad citizen, had any remedy in law. In our estimation, when Congress selects a state court as its agent it takes the court and all its appropriate and necessary machinery along with it, for better or worse. It thus accepts an indivisible situation on the same ground that the common law of England compels a man to take his wife— "for that he hath adopted her and her circumstances together." Another conclusion would be worse than illogical; it would be a denial of justice in many cases and would tend to destroy the necessary unity and entirety of its due and orderly administration.

Beyond this, although far inferior to it in point of importance, the case relied on at the bar in support of the district attorney's opposition to our entertaining this petition in error does not in our opinion support the contention. It is the case of *United States* v. *Dolla,* 177 Fed. Rep., 101. The first point of departure between it and the case here, and it is a wide one, is that the appeal there was not that of an applicant to whom citizenship had been denied by the inferior court, but an appeal of the Government, which was urging a reversal, so that his application might be denied. The alleged grievance was not that of a perhaps poor and oppressed alien, but that of a powerful but overreached sovereign. The real point of the appeal is suggested in the bill of exceptions as that of the color line. There seems to have been a suspicion of the old "visible admixture" days; but the bill discloses as an apparently redeeming feature that the applicant had bought a lot in a Savannah graveyard, in which none but whites were allowed to be buried, thus evincing an unwillingness to enter the Jim Crow heaven reserved for those whose color is accidentally black and for those numerous ones of intermediate shades, who did not grow upon trees and whom their white "uncles" were desirous not to have as fellow-citizens here nor as brother saints "over there."

However, the right of review was refused on two grounds by the United States Circuit Court of Appeals. One was that an application for naturalization is not a "case," within the mean-

ing of the federal statutes allowing appeal and error. Instead, it was held to be a "special proceeding," for a review in which case those statutes make no provision. "Special proceedings" in Ohio law are, as we think, the subjects of review in this court by the comprehensive terms of Section 12247 of the General Code, already referred to.

The other point in the case cited was that the allowance of the application for citizenship could be attacked by direct action to annul and cancel the order of allowance. And so the Government had a remedy thus given by the act of 1906, and the right of review would be a barren and inappropriate right. This remedy, present in that case, would be wholly wanting in the proceeding at bar; here, the error assigned is that of refusing to admit, and not of admitting, to citizenship. The reason of that case, therefore, fails; and if the case were to be applied as an authority it would defeat and not promote a remedy to which the applicant might in a proper case be entitled.

The brief for the Government in the case at bar says: "It is hardly conceivable that Congress intended that appeals in naturalization cases should be taken in the state courts while it is not permissible in the federal courts." We shall not stop to haggle over either the grammar of this argument or the meaning of the word "appeal" as we know it, and can not otherwise know it, under Ohio law; in strictness we know that neither in such cases is an appeal allowed in our state courts.

What we *do* say is that in our opinion it is quite inconceivable that a court which is allowed to advance a remedy bottomed on merit should refuse to do so.

We shall refuse the motion of the Government to dismiss this petition without examination of its allegations of error, and shall take jurisdiction of the case.

In so deciding we are not only discharging our duty in administering the laws of our state in their integrity—laws indivisible in their administration, as from their nature and intendment they must be—but we are also clearing our oaths of office in seeing that justice is done and in not denying in a proper case the right of judicial review. We also vindicate the wisdom of the maxim, *judicis boni est judisdictionem ampliare;* to enlarge his jurisdiction is the part of the good judge. It is not quite true to say that a rejected application may be at once made

anew in the same or another court. As the record in the case is transmitted to the Government, and by it sent to other courts for reference, the applicant stands before any later court as a blacklisted man and at a great disadvantage.

Coming now to the charge of intervening error in the action of the court below in refusing the application for naturalization, we find the material facts to be these:

The applicant, Vura, circulated and used printed cards of the following form and words:

Real Estate and
Insurance of
All Kinds.
Cuy. Telephone
Princeton
2365R.

VURA AND MESZAROS,
Law Offices.
8115 Holton Ave.          Cleveland, Ohio.

Neither of the men whose names appear on that card was a lawyer, nor had either ever been admitted to the bar.

In the month of February last Vura handed one of these cards, on which the name of Meszaros had been erased and that of Istvan overwritten in pencil, to the wife of one Szabo, and requested her to tell her husband to call at his office. This Szabo had made an affidavit in the federal court in this city, before a United States examiner, in an investigation concerning one Steven Kadi. Szabo called accordingly at Vura's office and the latter told him that he was informed by people in the neighborhood that he, Szabo, had been misinterpreted by the interpreter in the making of the affidavit in question; that Szabo had probably told the truth in what he said, but that having been interpreted wrongly he was likely to get into trouble about it; and that if he, Szabo, would make a signed statement before him, Vura, he could perhaps relieve him from harm. Vura had such a statement already written out when Szabo called at his office, and the statement was of considerable length. Szabo did not read the statement further than to see that his own name was on it, and left without signing.

Vura explained this transaction by saying that he did what he did out of a desire to be well thought of by the Hungarians who dwelt in his neighborhood by being made to appear instru-

mental in getting a man out of undeserved trouble. He also claimed that his partner, Meszaros, was an Hungarian lawyer, by which it appears he meant a lawyer in Hungary but not in the United States. Vura produced several witnesses—perhaps five in all—who swore that he was a man of good moral character; but we attach little or no importance to oaths of that kind, taking them as they run.

The judge of the common pleas court held that Vura had not shown himself to have been of good moral character during the whole of his residence in the United States, and in our opinion the record in the case sustains the finding. The card circulated by Vura held him out as an attorney at law, purposely, as we think, with the expectation that this false pretense would deceive others into intrusting to him business which he could not perform. It was a palpable deception, a badge of fraud, and an attempt to injure a class of people who would be helpless against his schemes for an ill-gotten gain. Naturalization would only put into his hands additional weapons for the perpetration of his frauds, such as the advantage of becoming a notary public, which we may suspect was a part of his design in seeking to be made a citizen. The calling of Szabo's wife and of Szabo himself to his office was intended, we can not doubt, to stir up trouble instead of avoiding it. Any act of any person, whether judge or layman, which will render the helpless, because ignorant, stranger within our gates a less easy prey to the wolves in the shape of knowing but conscienceless countrymen, is to be commended by every lawful means at hand. The affirmance of disabling judgments in cases warranted by the facts and permitted by the rules of law should be included. It is clear to our minds that the application of Vura was rightly rejected. A cloud of such witnesses as Vura brought, swearing on a cartload of Bibles, could not take off all the contrary conclusions which even this short record discloses or suggests. To admit such a man to become a citizen would be to swindle the nation, which once was treason by law.

Since this is a case of first instance in this court, and as like cases may come here for review from time to time, we deem it no impropriety to say, and we say it that it may be depended upon, that we should hesitate a long time before overruling in

a matter of naturalization a judge who has had the applicant visibly before him. The right to become a citizen under free institutions and mild government is a grave and important thing. The process should be regarded as the applicant's civil sacrament. Before being granted it is a high privilege to him to ask for it, and on the part of the Government a bounty or act of grace. When it is granted it assumes proportions of a much more imposing character. It confers upon the petitioner advantages beyond valuing or forgetting. On the admitting government it devolves serious duties of protection and immunity. Until within relatively recent times, naturalization in Great Britain could be accorded only by letters-patent under the great seal, or by act of Parliament, and even then it conferred only qualified privileges, the right to sit in Parliament not being among them.

In a government where the ballot of the felon goes into the box with as much potency as that of the saint, that of the deserved pauper with equal power to that of him who has the most momentous property stake in a government of law and order, it is doubly important that those charged with the high duty of making voters should be vigilant and watchful against unworthy applicants. It was the reproach of Carlyle that he could have little faith in the future of a country where Judas and Jesus are political equals. It is for admitting courts, among other agencies, to see that the Scotchman's gibe is undeserved by us.

The oath which the new-made citizen must take promises that he is "attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same." The trial court has many facilities, which a reviewing court can not have, for knowing whether that oath is likely to be kept or not. The demeanor of a loafer, the avowal of the wish for anarchy, a whiskey breath, any of the many but undescribable-on-paper manifestations of general down-at-the-heelness and bad citizenship, may be evidences why the vow will not be observed and why the applicant is not "attached to the principles" of our government, and why he is not "well-disposed to the good order and happiness" of our people.

There is no more imperative duty laid upon the courts than

that of doing their part in moulding to good citizenship such part of the material—much of it excellent material and much of it quite the reverse—that is being cast upon our shores every day. In this respect the courts can be to the political health of the country what the medical profession at our ports is to its physical health. Rejection of improper naturalization attempts and deportation of undesirables are both in the line of service to the present and future of America.

For this reason, among others, we repeat that as the duty of review in such cases is cast upon this court, a large presumption in favor of the conclusion reached below will be indulged here. The judgment is affirmed.

*Judgment affirmed.*

WINCH, J., and MEALS, J., concur.